COURT OF APPEALS
DECISION
DATED AND FILED

July 28, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP491**

**STATE OF WISCONSIN**

Cir. Ct. No. **2017FO1430**

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

DARRIN STINGLE,

   DEFENDANT-APPELLANT.

        APPEAL from a judgment of the circuit court for Outagamie County: MARK J. McGINNIS, Judge. *Reversed and cause remanded for further proceedings.*

        ¶1    STARK, P.J.[1]   Darrin Stingle appeals a judgment entered following a bench trial at which the circuit court determined that he violated WIS. STAT.

---

        [1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

§ 281.36(3b)(b) by discharging fill material into a wetland without a permit. Stingle does not dispute that he placed fill in the areas in question, and he concedes he did not have a permit to do so. He argues, however, that the court erred by finding that the areas in question constituted wetlands. He therefore argues the evidence at trial was insufficient to show that he violated § 281.36(3b)(b). In the alternative, Stingle asks us to reverse and remand for a new trial because the circuit court judge was objectively biased against him.

¶2 We conclude the evidence at trial was sufficient to support the circuit court's finding that the areas where Stingle placed fill constituted wetlands. As such, the evidence was sufficient to support the court's determination that Stingle violated WIS. STAT. § 281.36(3b)(b). We agree with Stingle, however, that the record shows the court was objectively biased against him. We therefore reverse and remand for a new trial before a different judge. Finally, we deny Stingle's request that we impose sanctions on the State for its failure to timely file its response brief.

## BACKGROUND

¶3 Stingle owns property in Outagamie County, which he uses as farmland. On October 15, 2015, Scott Koehnke, a senior water management specialist at the Wisconsin Department of Natural Resources (DNR), visited Stingle's property and observed fill in areas of the property that he believed were wetlands. On September 16, 2016, the DNR sent Stingle a notice of violation, which alleged that he had violated WIS. STAT. § 281.36(3b)(b) by placing fill in wetlands on his property without a permit. The notice asked Stingle to attend an enforcement conference with DNR employees on September 30.

¶4    During the enforcement conference, Stingle represented that he had retained Steve Frings to complete a wetland delineation report regarding his property. Frings subsequently completed his report and submitted it to the DNR. The DNR conducted its own site reviews of Stingle's property in April and June 2017 to determine whether Frings' delineation was accurate. Following those visits, the DNR determined it did not concur with Frings' delineation, and on July 31, 2017, it issued Stingle a citation for violating WIS. STAT. § 281.36(3b)(b).

¶5    At the DNR's request, Stingle subsequently obtained a second wetland delineation report, this time prepared by Travis Stuck, a professional wetland scientist and "preferred DNR professionally assured wetland delineator." Stuck visited Stingle's property a total of three times in September and November 2017. In his report, Stuck opined that there were twelve separate areas on Stingle's property that qualified as wetlands. Stuck further opined that fill had been placed in five of those areas—Wetlands 2, 3, 5, 7 and 9.

¶6    A one-day bench trial regarding the DNR's citation took place on February 27, 2019, before Judge Mark McGinnis. At trial, it was undisputed that Stingle had placed fill on his property, and that he had done so without a permit. The only disputed issue was whether the areas where Stingle had placed the fill constituted wetlands. In support of its case, the State relied on Stuck's testimony and report, along with the testimony of several DNR employees. In response, Stingle testified on his own behalf, and he also called Michael Graham, a wetland consultant who testified regarding his review of Stuck's report.

¶7    After hearing the parties' evidence, the circuit court concluded the State had satisfied its burden to prove, "by clear, convincing, and satisfying evidence," that the areas in question constituted wetlands. The court therefore

found Stingle guilty of violating WIS. STAT. § 281.36(3b)(b). The court imposed a fine and ordered Stingle to remove the fill by July 1, 2019.

¶8      Stingle now appeals, arguing the evidence was insufficient to show that he violated WIS. STAT. § 281.36(3b)(b) because it did not establish that the areas in question were wetlands. In the alternative, he seeks a new trial on the grounds that the circuit court judge was objectively biased against him. We address these arguments in turn and include additional facts below where relevant. We also address, and deny, Stingle's request that we impose sanctions on the State for its failure to timely file its response brief.

## DISCUSSION

### I. Sufficiency of the evidence

¶9      WISCONSIN STAT. § 281.36(3b)(b) provides, in relevant part, that "[n]o person may discharge dredged material or fill material into a wetland unless the discharge is authorized by a wetland general permit or individual permit issued by the department under this section." As noted above, the only disputed issue in this case was whether the parts of Stingle's property where he discharged fill material without a permit qualified as wetlands. For purposes of § 281.36(3b)(b), the term "wetland" means "an area where water is at, near, or above the land surface long enough to be capable of supporting aquatic or hydrophytic vegetation and which has soils indicative of wet conditions." WIS. STAT. §§ 23.32(1), 281.01(21).

¶10     WISCONSIN STAT. § 281.36(2m), in turn, provides that for purposes of delineating the boundaries of a wetland under § 281.36,

4

> the procedures contained in the wetlands delineation manual published by the U.S. army corps of engineers shall be used. The edition of the manual that shall be used shall be the 1987 edition of the manual and any document that the U.S. army corps of engineers issues interpreting that manual.

The administrative code similarly provides that when delineating the boundaries of a nonfederal wetland, "[t]he manual to be used is the 1987 edition of the U.S. army corps of engineers wetland delineation manual and any document that the U.S. army corps of engineers issues interpreting the manual." WIS. ADMIN. CODE § NR 352.01(2) (Jan. 2014).

¶11     Stingle argues that, in this case, the DNR "admitted it did not follow the proper wetland delineation procedures in the 1987 U.S. Army Corps of Engineers Manual." Stingle therefore argues the circuit court "erred in finding the areas in question … met the statutory definition of a wetland." Accordingly, Stingle asserts the evidence was insufficient for the court to find that he violated WIS. STAT. § 281.36(3b)(b). We disagree. Instead, for the reasons discussed below, we conclude the evidence was sufficient for the court to find that Stuck— the expert who performed the second wetland delineation on Stingle's property— followed the procedures set forth in the 1987 Corps Manual in determining that the areas in question qualified as wetlands.[2]

---

[2] Stingle argues that before addressing the sufficiency of the evidence, we must address an issue of statutory interpretation—namely, whether WIS. STAT. § 281.36(2m) "requires the DNR to delineate wetlands according to the 1987 Corps Manual and applicable supplements." The State does not dispute, however, that a wetland delineation for purposes of § 281.36 must be performed according to the procedures set forth in the 1987 Corps Manual and its applicable supplements. As set forth above, the relevant statutory and administrative code provisions clearly and unambiguously require compliance with the 1987 Corps Manual.

¶12 "The test for determining sufficiency of the evidence is whether a reasonable trier of fact could be convinced of the defendant's guilt to the required degree of certitude by the evidence which it had a right to believe and accept as true." *City of Milwaukee v. Wilson*, 96 Wis. 2d 11, 21, 291 N.W.2d 452 (1980). Here, the circuit court concluded—and Stingle does not dispute—that the State was required to prove Stingle's guilt by clear, satisfactory, and convincing evidence. *See id.* at 21-22 (noting that "in forfeiture actions which involve or are closely associated with acts of a criminal nature," the defendant's guilt "must be proved by clear, satisfactory and convincing evidence").

¶13 When reviewing the sufficiency of the evidence, the question is not whether this court would find the defendant guilty based on the evidence presented at trial. *Id.* at 21. Instead, "[o]ur task as a reviewing court is limited to determining whether the evidence presented could have convinced a trier of fact, acting reasonably, that the appropriate burden of proof had been met." *Id.* In so doing, we view the evidence in the light most favorable to the State and the conviction. *See State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). The credibility of the witnesses and the weight of the evidence are issues for the trier of fact, not this court, to determine. *Id.* at 504. In addition, if more than one reasonable inference can be drawn from the evidence, we must accept the inference drawn by the trier of fact. *Id.*

¶14 At trial, Stuck and two of the State's other witnesses testified that in order for an area to qualify as a wetland under the 1987 Corps Manual, it must meet three criteria: (1) hydric soils; (2) prevalence of hydrophytic vegetation; and (3) hydrology. Stingle agrees that these are the applicable criteria under the 1987 Corps Manual. We conclude the evidence at trial was sufficient for the circuit court to find that these three criteria were satisfied for each of the five areas where

6

the State alleged that Stingle discharged fill into a wetland without a permit—namely, the areas identified in Stuck's report as Wetlands 2, 3, 5, 7 and 9.

¶15    As for the first criterion, one of the State's witnesses—DNR wetland mitigation coordinator Thomas Nedland—testified that hydric soils are "wetland soils." One of the attachments to Stuck's report further explains that hydric soils are "soils that formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part." Stuck's report and testimony show that he detected the presence of hydric soils in the areas he identified as Wetlands 2, 3, 5, 7 and 9. On appeal, Stingle does not appear to dispute that Stuck's report and testimony provided a sufficient basis for the circuit court to find that hydric soils were present in the identified areas. In fact, after the State presented its case at trial, Stingle's attorney conceded, "There's a lot of hydric soil. Testimony is consistent."

¶16    Turning to the second criterion—prevalence of hydrophytic vegetation—Nedland explained that hydrophytic plants are "water-loving plants" or "plants that can tolerate ponding or flooding or a high water table." Stuck did not observe a prevalence of hydrophytic vegetation in Wetlands 2, 3, 5, 7 and 9. He testified, however, that a prevalence of hydrophytic vegetation is required only when the site in question is under "normal circumstances." When a site has been farmed, it is not under "normal circumstances," and a prevalence of hydrophytic vegetation is not required. Nedland similarly testified that under the applicable supplements to the 1987 Corps Manual, in a "significantly disturbed setting like a farmed area … [y]ou don't necessarily have to have the vegetation present. You can have just hydric soils present and wetland hydrology present and still call it [a wetland]."

7

¶17    Stuck observed in his report that Wetlands 2, 3, 5, 7 and 9 were not under "normal circumstances" because the vegetation at those sites had been "significantly disturbed." Specifically, he noted that Wetlands 2, 3, 5 and 7 had soybeans growing in them. With respect to Wetland 9, Stuck noted that site was "recently chisel plowed, thus vegetation was not included as it was difficult to ID. Vegetation is obs[c]ured regardless because it is a 'managed plant commun[]ity'."

¶18    Stuck's and Nedland's testimony, along with Stuck's report, provided a sufficient basis for the circuit court to find that under the 1987 Corps Manual and its supplements, a prevalence of hydrophytic vegetation was not required for the areas in question to qualify as wetlands because they had been farmed and therefore were not under "normal circumstances." Moreover, Stingle does not dispute on appeal that, because the relevant areas were not under "normal circumstances," a prevalence of hydrophytic vegetation was not required for them to qualify as wetlands.

¶19    Stingle does dispute, however, that the State proved the third wetland criterion—hydrology. Nedland testified that for an area to have wetland hydrology, "[w]e need to have ponding or flooding or a water table within 12 inches of the soil surface for 14 consecutive days during the growing season in most years." Under the 1987 Corps Manual, in order to determine that an area has wetland hydrology, one must observe at least one primary indicator of wetland hydrology or at least two secondary indicators.

¶20 Stuck conceded at trial that he found no primary indicators of wetland hydrology for Wetlands 2, 3, 5, 7 and 9.[3] He maintained, however, that he found two secondary indicators for Wetlands 2, 3, 5 and 9—specifically, geomorphic position[4] and saturation visible on aerial imagery. For Wetland 7, Stuck found three secondary indicators—geomorphic position, saturation visible on aerial imagery, and surface soil cracks. Accordingly, based on Stuck's testimony and report, the circuit court could find that Wetlands 2, 3, 5, 7 and 9 met the hydrology criterion for designation as wetlands.

¶21 Stingle argues the circuit court could not rely on Stuck's testimony and report because Stuck failed to follow the procedures set forth in the 1987 Corps Manual and its applicable supplements in two ways when assessing the hydrology criterion. First, Stingle argues Stuck "agreed" at trial that geomorphic position "should not be utilized as a secondary indicator if there is evidence that an area has been tiled or ditched." Stingle then asserts that Stuck testified he "knew of and saw prior-existing drainage ditches on Stingle['s] property," but he "conceded [he] did not consider such drainage when doing [his] … delineation."

---

[3] Stuck's report lists the following as primary indicators of hydrology: surface water; high water table; saturation; water marks; sediment deposits; drift deposits; algal mat or crust; iron deposits; inundation visible on aerial imagery; sparsely vegetated concave surface; water-stained leaves; aquatic fauna; marl deposits; hydrogen sulfide odor; oxidized rhizospheres on living roots; presence of reduced iron; recent iron reduction in tilled soils; and thin muck surface.

[4] A supplement to the 1987 Corps Manual explains that geomorphic position "is present if the immediate area in question is located in a depression, drainageway, concave position within a floodplain, at the toe of a slope, on the low-elevation fringe of a pond or other water body, or in an area where groundwater discharges."

¶22 Stingle misrepresents Stuck's testimony. At trial, Stingle's attorney questioned Stuck about a supplement to the 1987 Corps Manual, which states that geomorphic position "is not applicable in areas with functioning drainage systems." Counsel insinuated that because it was undisputed that Wetlands 2 and 3 were originally constructed as drainage ditches, and because there was evidence that drain tile was present on Stingle's property, Stuck should not have used geomorphic position as a secondary indicator of wetland hydrology for any of the areas at issue in this case.

¶23 In response, Stuck explained that he was aware the supplement to the 1987 Corps Manual stated geomorphic position should not be used as a secondary indicator of hydrology in areas with "functioning" drainage systems. He testified, however, that in his opinion Stingle's property did not have a "functioning" drainage system. For instance, Stuck testified that although both ditches on the property (i.e., Wetlands 2 and 3) were constructed for the purpose of moving water, he did not know "that they ever actually moved a lot of water." He also testified, based on his "extensive experience and knowledge" of the area, that a "linear feature" like Wetland 3 "would not drain that well." Stuck similarly described Wetland 2 as a "linear feature." Furthermore, when asked whether he had considered the impact that the Wetland 2 drainage ditch would have had on the adjacent Wetland 5, Stuck responded, "If I thought it affected it, then I would have had it in the report."

¶24 Stuck also testified regarding the impact that the possible presence of drain tile had on his analysis. He conceded that he did not recall asking Stingle whether there was drain tile on his property. He testified, however, that he "did not see any indicators of tile on this site." He further testified:

> The impact of tile as far as draining wetlands is a function of the depth of the tile, invert of the tile, and the soil type. And these are—I believe these all generally are a silty clay, heavy clay, which you have to have pretty tight spacing of tile to effectively drain the soils of this area. To my knowledge that's what I did with [the Natural Resources Conservation Service]. I studied the effects of tiles and had to field truth it many times.
>
> …. The tile doesn't drain our soils especially in this area very well at all. So just say this was a tile there. That doesn't necessarily mean it would impact this particular location.[5]

¶25 Ultimately, Stuck testified that it is "standard practice" to consider "the effect of ditching and tiling on a site" when performing a wetland delineation. Based on his training, however, he opined that any drainage system on Stingle's property was not "functioning" because it was not "effectively draining" the site. He further explained that his "professional judgment" supported using geomorphic position as a secondary indicator of wetland hydrology in this case because "if this was a functioning drainage system … [y]ou can actually have soils that … start to reoxidize and the color changes. I didn't see any evidence of that." Stuck testified that if he had seen evidence of reoxidization, it would have been "indicative of a functioning drainage system."

¶26 The above testimony shows that, contrary to Stingle's assertion, Stuck did not "agree" that it is inappropriate to use geomorphic position as a secondary indicator of wetland hydrology whenever there is evidence that an area has been tiled or ditched, nor did Stuck concede that he did not consider the

---

[5] Graham—Stingle's expert witness—similarly testified that the mere presence of drain tile "doesn't mean it is completely or effectively draining a wetland even though it's put there to remove water. In the case of a dysfunctional tile, of course, you could certainly get hydrology back into a situation, into a depressional area."

11

drainage system on Stingle's property when performing his delineation. Instead, Stuck testified that: (1) based on his training and his interpretation of the 1987 Corps Manual and its supplements, it is inappropriate to use geomorphic position as a secondary indicator only when the area in question has a "functioning" drainage system; and (2) in his professional opinion, any drainage system on Stingle's property was not "functioning." Based on that testimony, the circuit court could reasonably conclude that Stuck complied with the 1987 Corps Manual and its supplements by using geomorphic position as a secondary indicator of wetland hydrology on Stingle's property.[6]

¶27     Stingle also argues that Stuck failed to comply with a supplement to the 1987 Corps Manual because he "admitted that, although he checked the box for the secondary hydrology indicator of 'saturation visible on aerial imagery' for wetland no. 7, he, in fact, did not find any wet signatures on the 6 aerial photos he reviewed for the area." Again, Stingle's characterization of Stuck's testimony is not wholly accurate.

¶28     Stuck testified that during his offsite review of Wetland 7, he reviewed a number of aerial images dating from 1983 through the spring of 2015. Only six of those images fell within "normal climate conditions," and of those six images, none showed any "wet signatures." Stuck testified, however, that he

---

[6] Graham testified that, in his opinion, Stuck "improperly used" geomorphic position "on all five of the wetlands in question." However, the circuit court was not required to accept Graham's opinion. *See* **Krueger v. Tappan Co.**, 104 Wis. 2d 199, 203, 311 N.W.2d 219 (Ct. App. 1981) (stating a fact finder "is not bound by the opinion of an expert … even if the opinion is uncontradicted"). In fact, there were valid reasons for the court to reject Graham's testimony that Stuck's use of geomorphic position was improper. Specifically, Graham conceded that he had never been to Stingle's property, and he therefore had no knowledge as to whether the ditches on the site "were adequately draining the location."

observed "indicator[s] of saturation" on some of the other aerial images he reviewed from years that did not have "normal" precipitation.

¶29     In response, Stingle's attorney asserted that the 1987 Corps Manual "does guide you … to highlight the normal years because everything might be wet at some point but we're not calling everything wetlands." Stuck disagreed, testifying that, in his opinion, it was "irrelevant" under the 1987 Corps Manual that he did not observe any wet signatures on the aerial images of Wetland 7 from normal years because he saw indicators of saturation on images from other years.

¶30     Thus, Stuck testified it was appropriate for him to rely on aerial images from years with abnormal precipitation when assessing whether indicators of saturation were present for Wetland 7. Notably, Stingle has not produced or cited any portion of the 1987 Corps Manual or its supplements stating that Stuck's use of aerial images from years with abnormal precipitation was inappropriate. At trial, Graham testified the manual "says be cautious of using just a wet year and a small sample size." Graham subsequently testified he "believe[d]" that "the off-site methodology asks for a minimum of five normal years, and there's other provisions if you can't find five normal years. There's other ways to get a large enough sample size to do the method." Graham did not clearly testify, however, that either the 1987 Corps Manual or any applicable supplement *prohibits* using only a wet year when assessing whether saturation is visible on aerial imagery. Accordingly, the circuit court was entitled to accept Stuck's testimony that his use

13

of "saturation visible on aerial imagery" as a secondary indicator of wetland hydrology for Wetland 7 was appropriate under the 1987 Corps Manual.[7]

¶31    Stingle next asserts that Stuck "admitted" he did not follow the procedures in the 1987 Corps Manual and its supplements when performing his wetland delineation on Stingle's property.  Stingle does not, however, cite any portion of the trial record where Stuck made such an admission.  Instead, as the above-summarized testimony demonstrates, Stuck maintained that he complied with the 1987 Corps Manual; he simply interpreted certain sections of the manual differently than Stingle's attorney and expert witness.

¶32    Finally, Stingle notes that at one point during his trial testimony, Stuck stated "it's really not worth a whole lot to me, honestly, to do a wetland determination following the '87 manual."  Stingle asserts this statement shows that Stuck did not follow the 1987 Corps Manual.  We disagree.  Regardless of Stuck's personal opinion of the manual's value, Stuck testified that he complied with the procedures set forth in the manual.  Although Stingle presented contrary evidence suggesting that Stuck did not comply with the manual—specifically, Graham's testimony—the circuit court was not required to accept that evidence.

¶33    In all, Stuck's testimony provided sufficient evidence for the circuit court to find that the relevant areas on Stingle's property qualified as wetlands, for purposes of WIS. STAT. § 281.36(3b)(b).  In particular, the evidence was sufficient

---

[7] We also observe that, even if Stuck failed to comply with the 1987 Corps Manual when assessing whether saturation was visible on the aerial images of Wetland 7, he also found two other secondary indicators of wetland hydrology for Wetland 7—geomorphic position and surface soil cracks.  Those two secondary indicators, standing alone, would have provided a sufficient basis for the circuit court to find that Wetland 7 met the hydrology criterion for delineation as a wetland.

for the court to find that Stuck complied with the 1987 Corps Manual and its supplements when performing his wetland delineation. We therefore reject Stingle's argument that the evidence was insufficient to support the court's determination that he violated § 281.36(3b)(b) by placing fill in wetlands without a permit.

## II. Judicial bias

¶34 In the alternative, Stingle argues he is entitled to a new trial because Judge McGinnis was objectively biased against him.[8] "The right to an impartial judge is fundamental to our notion of due process." *State v. Goodson*, 2009 WI App 107, ¶8, 320 Wis. 2d 166, 771 N.W.2d 385. Whether Judge McGinnis's partiality can reasonably be questioned is an issue of law that we review independently. *See Miller v. Carroll*, 2020 WI 56, ¶15, __ Wis. 2d __, 944 N.W.2d 542. In so doing, we presume that Judge McGinnis acted fairly, impartially, and without bias. *See id.*, ¶16. To overcome that presumption, Stingle must demonstrate the existence of bias by a preponderance of the evidence. *See id.*

¶35 Although a judge may be either subjectively or objectively biased, *see id.*, ¶21, only objective bias is at issue here. Our supreme court recently clarified that, when assessing objective bias, we must apply the standard set forth in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). *Miller*, __ Wis. 2d __, ¶24. Specifically, we must "ask whether there is 'a serious risk of actual

___

[8] Stingle did not raise any issue regarding judicial bias in the circuit court—either in a postdisposition motion or otherwise. However, the State does not argue that Stingle forfeited his judicial bias argument by failing to raise it below. We therefore address the merits of Stingle's argument.

bias—based on objective and reasonable perceptions.'" *Id.* (quoting *Caperton*, 556 U.S. at 884). Stated differently, we must consider "whether the circumstances 'would offer a possible temptation to the average ... judge to ... lead him not to hold the balance nice, clear and true.'" *Id.* (quoting *Caperton*, 556 U.S. at 885).

¶36    When the record indicates that a judge "has prejudged the facts or the outcome of the dispute," the judge "cannot render a decision that comports with due process." *Franklin v. McCaughtry*, 398 F.3d 955, 962 (7th Cir. 2005) (citation omitted); *see also Goodson*, 320 Wis. 2d 166, ¶17. In this case, we conclude Stingle has overcome the presumption that Judge McGinnis was impartial because the record shows that he twice made comments at trial indicating that he had prejudged Stingle's guilt.

¶37    Judge McGinnis's first set of comments occurred during the State's questioning of its final witness—Koehnke—before Stingle had the opportunity to present any evidence. The State had just asked Koehnke whether Stingle was aware that the DNR wanted him to remove the fill from his property. Koehnke responded in the affirmative and added, "Our goal from Day 1 was get the material out of the wetlands, and we will be satisfied that the violation no longer exists and that will be the end of it."

¶38    The State then began to ask another question, but Judge McGinnis interrupted, stating, "Can I just ask a question? Why hasn't that been done?" The following exchange then occurred:

> [DEFENSE COUNSEL]: Excuse me, your Honor?
>
> THE COURT: Why hasn't that been done?
>
> [DEFENSE COUNSEL]: What's been done?

THE COURT: Stuff just getting removed before today or has it been?

[DEFENSE COUNSEL]: No, it has not been. I mean we're contesting that, whether it's a wetland area.

THE COURT: Got it, which I figured out by now.

[DEFENSE COUNSEL]: No, I understand that. I mean that's the answer. I mean we have been working with. I have been involved relatively recently, but they have been earlier working with the DNR. And it took—I don't know what happened with the Frings report or the Stuck report, why it took so long to get to the DNR.

THE COURT: My question was why doesn't your client just take whatever it is, the fill, and remove it and clean it up the way they want it to be cleaned up? Maybe you have answered it. He's just set on the position that he doesn't have to. He doesn't have to comply and it's not a wetland?

[DEFENSE COUNSEL]: Right. He doesn't believe he's violated the law.

THE COURT: Okay.

[DEFENSE COUNSEL]: If you determine he violated the law, he will obviously remove the fill.

THE COURT: Yeah. So he's just that stubborn.

¶39   We agree with Stingle that these comments would lead a reasonable person to conclude that Judge McGinnis had prejudged Stingle's guilt, thus creating a serious risk of actual bias. *See* ***Miller***, __ Wis. 2d __, ¶24. Based on Judge McGinnis's comments, a reasonable person would conclude he had made up his mind—before Stingle even had an opportunity to present his case—that the areas in question qualified as wetlands, that Stingle should have already removed the fill from them, and that his refusal to do so was simply because he was "stubborn" and "set on the position" that he did not need to remove the fill.

¶40     The State argues Judge McGinnis's comments during Koehnke's testimony were merely "a clarifying inquiry regarding what the actual issues [were] in the trial." The record belies this assertion. When Judge McGinnis initially asked why Stingle had not yet removed the fill, Stingle's attorney explained that he had not done so because he was contesting whether the areas in question were wetlands. Judge McGinnis then responded, "Got it, which I figured out by now." That response indicates Judge McGinnis was already aware that the disputed issue at trial was whether the areas in question were wetlands. As such, we reject the State's argument that his comments were merely an attempt to clarify the issues that were being tried.

¶41     Moreover, even if we could construe Judge McGinnis's comments as showing that he believed Stingle may have had a basis to assert that the areas in question did not constitute wetlands, Judge McGinnis's comments clearly reflect that he thought Stingle was being unreasonable by forcing the parties to go through a trial in order to enforce his rights. Judge McGinnis's comments indicate that he knew the disputed issue was whether the relevant areas were wetlands, and regardless of whether he had already determined the areas were wetlands, he believed Stingle should remove the fill and was merely being "stubborn" by refusing to do so and forcing the parties to go through a trial. Under these circumstances, Judge McGinnis clearly prejudged Stingle's responsibility to remove the fill and failed to hold the balance "nice, clear and true." Again, we consider it significant that Judge McGinnis made the comments in question before Stingle even had an opportunity to present any evidence.

¶42     In addition, immediately after Judge McGinnis found that Stingle had violated WIS. STAT. § 281.36(3b)(b), he made a second comment indicating

that he had prejudged Stingle's guilt. At approximately 5:25 p.m., Judge McGinnis stated:

> So for those reasons you are guilty.
>
> *I have been trying to focus on or think about the last 15 minutes or so, you know, what's the consequence?* I have looked at the statute, as I understand it, [WIS. STAT. §] 281.36(14). If I am correct, it can be a forfeiture of not less than $100 nor more than $10,000. That's the range that we have, right?

(Emphasis added.) Notably, at 5:15 p.m.—ten minutes before the court made the comment quoted above—the State had just begun to provide rebuttal testimony from Koehnke. Fifteen minutes before the court made its comment about considering "the consequence"—i.e., the penalty the court would impose for Stingle's violation—Stingle was still testifying in his case-in-chief. The court's comment that it had been considering "the consequence" for the last fifteen minutes therefore suggests the court had determined that Stingle violated § 281.36(3b)(b) before the close of evidence—indeed, before Stingle even finished his testimony—and was already thinking about what penalty it would impose for that violation.

¶43 The State asserts Judge McGinnis's statement about considering "the consequence" is not indicative of bias because Koehnke's rebuttal testimony added "very little, if anything, … to the evidence already offered by the parties." Be that as it may, Judge McGinnis did not know, at the time he apparently began considering "the consequence," what the substance of Koehnke's rebuttal testimony would be. Moreover, the State fails to acknowledge that fifteen minutes before Judge McGinnis made the statement in question, Stingle was still on the witness stand.

¶44    We acknowledge that Judge McGinnis made his statement about considering "the consequence" very near to the end of trial, after the parties had already introduced nearly all of their evidence.  As such, if asked to consider whether that statement alone was sufficient to demonstrate judicial bias, we might not conclude that it was.  As set forth above, however, Judge McGinnis also made comments during the State's case-in-chief that would lead a reasonable person to conclude he had prejudged Stingle's guilt.   Judge McGinnis's subsequent comment about considering "the consequence" further supports a conclusion that he had decided Stingle was guilty before the parties finished presenting their evidence.

¶45    On this record, we conclude Stingle has overcome the presumption that Judge McGinnis was unbiased by demonstrating "a serious risk of actual bias," based on Judge McGinnis's comments indicating that he prejudged Stingle's guilt.  We therefore reverse the judgment determining that Stingle violated WIS. STAT. § 281.36(3b)(b), and we remand for a new trial before a different judge.

## III.  Stingle's request for sanctions

¶46    In his reply brief on appeal, Stingle asks us to impose sanctions on the State for its failure to timely file its response brief.  Stingle notes that the State's response brief was due on July 5, 2019.  The State did not file its brief by that date or request an extension of the filing deadline.  The clerk of the court of appeals deemed the State's brief to be delinquent on July 16, 2019.  On July 23, the State filed a request for a thirty-day extension of the time to file its brief.  We partially granted the State's request and extended the filing deadline until

August 5. On August 1, the State requested another thirty-day extension, which we granted on August 5. The State then filed its brief on September 4.

¶47 We may impose sanctions when a party fails to comply with the Rules of Appellate Procedure, including "dismissal of the appeal, summary reversal, striking of a paper, imposition of a penalty or costs on a party or counsel, or other action as the court considers appropriate." WIS. STAT. RULE 809.83(2). Here, Stingle argues we should impose sanctions on the State because "it did not bother to request an extension until two weeks after its initial filing deadline, and then requested an additional 30-day extension when it apparently could not meet the already extended deadline." Specifically, Stingle asks us to "at a minimum, award some costs and fees in this appeal for the State's unjust delay and noncompliance with the Court's rules and deadlines."

¶48 Given that we granted the State's untimely request for an extension of the time to file its response brief, we decline to sanction the State at this juncture for failing to file its brief before the original filing deadline elapsed. We caution the State, however, that in future cases, if it believes it cannot comply with a filing deadline, it should request an extension *before* that deadline expires, as all litigants are required to do. The State should not assume that, in the future, we will necessarily grant untimely extension requests. Moreover, the State should be advised that while we have chosen not to impose sanctions in this case, future violations of the Rules of Appellate Procedure may result in sanctions. *See **id.***

*By the Court.*—Judgment reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

21